## FARR CO. v. UNION PAC. R. CO.
### No. 1766.

Circuit Court of Appeals, Tenth Circuit.
Aug. 30, 1939.

438

William R. Kelly, of Greeley, Colo., for appellant.

E. G. Knowles, of Denver, Colo. (T. W. Bockes, of Omaha, Neb., on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

On January 16, 1937, The Farr Company, a corporation, herein designated as Appellant, delivered to the Union Pacific Railroad Company, a corporation, herein designated as Appellee, at Greeley, Colorado, seven hundred (700) bags of pinto beans consigned to C. S. Stopher and Company at Lexington, Kentucky, with notice to stop the car at Louisville, Kentucky, for partial unloading by E. S. Farrell & Son. The bill of lading expressly provided that the carrier should not be liable for loss caused by an Act of God.

The carload of beans was transported by Appellee and arrived at Louisville, Kentucky, on the night of January 20, 1937. Early on the morning of January 21 it was delivered by Appellee to its connecting carrier, the Southern Railway Company, and was transported to the yards of the Southern Railway Company, where it was shunted on to a side track next to the freight depot, spoken of as the "bug alley track." This track was higher than the floor of the freight house and was the highest ground in the yards. In reaching this place the car had to pass under the Pennsylvania railroad bridge, this point being a low place in the tracks leading to the Southern Railway yards.

Heavy rains had been falling in the Ohio River Valley for a number of days preceding the arrival of this car, and continued falling for a number of days thereafter. These heavy rains had resulted in flood conditions in and around Louisville by the time this car arrived.

The Ohio River continued to rise steadily for a number of days after the 21st of January, and these conditions culminated in the worst flood that Louisville had experienced since records had first been kept. The river rose higher and the flood waters exceeded the flood of 1884, which was the most severe flood experienced by Louisville up to the time of the flood of 1937. Some water was on the track under the Pennsylvania bridge when this car was switched into the yards of the Southern Railway Company. The flood waters continued to rise, so that after approximately 8 o'clock on the evening of January 21 it was impossible for switch engines to enter or leave the Southern Railway yards and all switching operations were suspended until after the flood waters subsided.

Farrell and Son did not appear to unload their portion of the shipment. No instructions concerning the disposal of the car were given to the Appellee until the afternoon of January 22, when Stopher and Company requested that the entire car be moved to Lexington. This could not be done due to the flooded entrance of the tracks under the Pennsylvania bridge.

This car of merchandise was the only car left in the yards of the Southern Railway Company. A considerable amount of freight was left stored in the freight house of the Southern Railway Company, but all other car loads of merchandise except this car of beans had been moved from the yards.

Appellee continued movements of freight from its freight depot during January 22 and 23 by truck. The freight so moved was less than carload lots and was delivered to connections on other railroads to prevent delay in movement and for the purpose of getting it started to its destination.

There was no water at the point where this car stood as late as four o'clock P. M. on the 23rd day of January. Never before had flood waters reached the place where this car of beans was standing. The previous high mark of flood waters at this point had been approximately 46.7 feet. That point was reached in the flood of 1884. Flood waters would have to rise to nearly 55 feet before the car would be inundated, or approximately nine feet higher than any flood had ever risen in the history of Louisville.

After the 21st of January all railroad operations in Louisville were in a chaotic condition and after about the 23rd of Jan-

uary all efforts in the line of transportation were directed to removing people to a place of safety. Sometime during the late part of the 24th or thereafter flood waters entered this car and the cargo of beans was entirely destroyed. After the flood subsided the beans were dumped as being useless.

Appellant filed suit against Appellee charging Appellee with failure to safely carry and deliver the beans to Appellant or to Appellant's consignee and with negligently permitting the beans at Louisville, Kentucky, while in transit in said car, to become soaked with water and to be destroyed, and asked to recover the value of the shipment.

After the introduction of testimony, Appellee moved for a directed verdict on the ground that the evidence was not sufficient to establish negligence or violation of the terms of the bill of lading because Appellant had failed to make a prima facie case to submit to the jury for its determination. The motion was sustained and the court directed a verdict for Appellee, upon which judgment was entered. From this ruling an appeal is taken to this court.

▮ When damage is shown to have resulted from an immediate Act of God, such as a sudden and extraordinary flood, the carrier is exempt from liability unless the plaintiff proves that the defendant was guilty of some negligence in not providing for the safety of the goods. That he could do so must be proved by the plaintiff or must appear in the facts of the case. Memphis & C. Ry. Co. v. Reeves, 10 Wall. 176, 77 U.S. 176, 19 L.Ed. 909; Pinkerton v. Missouri Pac. Ry. Co., 117 Mo.App. 288, 93 S.W. 849; Ithaca Roller Mills v. Ann Arbor Ry. Co., 217 Mich. 348, 186 N.W. 516. The test to be applied is not the hindsight test, but the foresight test. The question is: Could the railroad company reasonably have anticipated that damage would be caused by such Act of God? Louisville & N. Ry. Co. v. Finlay, 233 Ala. 128, 170 So. 207; Empire State Cattle Co. v. A., T. & S. F. R. Co., C.C.Kan., 135 F. 135, affirmed 8 Cir., 147 F. 457, 210 U.S. 1, 28 S.Ct. 607, 52 L.Ed. 931, 15 Ann.Cas. 70.

Appellant contends that after the Act of God became imminent Appellee was negligent in not providing for the safety of the goods. It is contended that the evidence introduced at the trial of this cause shows such a state of facts as to cause reasonable minds to differ as to whether Appellee was guilty of negligence in the handling of this shipment of freight after it became apparent that an Act of God would intervene, and that, therefore, it was a question which should be submitted to the jury, and that the Court erred in instructing a verdict for Appellee.

▮ A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule. The rule is that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. Schuylkill & D. Improvement & R. Co. v. Munson, 14 Wall. 442, 81 U.S. 442, 448, 20 L.Ed. 867; Pleasants v. Fant, 22 Wall. 116, 89 U.S. 116, 122, 22 L.Ed. 780; Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L. Ed. 720. A scintilla of evidence will not support a verdict in the United States Courts. Larabee Flour Mills v. Carignano, 10 Cir., 49 F.2d 151; Central Surety & Ins. Co. v. Murphy, 10 Cir., 103 F.2d 117.

▮ It is the trial court's duty to direct a verdict at the close of the evidence, where evidence is undisputed or where evidence, though conflicting, is so conclusive that the court, in the exercise of sound judicial discretion, ought to set aside a verdict in opposition to it. New Amsterdam Casualty Co. et al. v. Farmers' Co-op. Union of Lyons, Kan., 8 Cir., 2 F.2d 214.

The flood of 1884 was the worst flood that had been experienced in the history of Louisville until the flood of 1937. In that flood, water rose to approximately 46.7 feet. Flood waters would have to rise nearly nine feet above this point before they would enter this car and damage the shipment. Was there any reason for Appellee to believe that such might be the case?

On the morning of January 20, the United States weather bureau sent out a forecast by radio broadcast stating that from present indications a flood of 38 to 39 feet might be expected at Louisville Saturday, stating, however, that if the rain became heavy this estimate might be exceeded, and that if the rain continued for the next 24 hours a 42 foot upper gauge might be reached early the next week. On the morning of January 21 a further bulletin was broadcast stating that without more rain about a 44 foot upper gauge could be expected; with more rain indicated however,

these estimates might be exceeded. At ten o'clock on the 21st a further bulletin was broadcast, stating that if rains continued for another 24 hours it was probable that the crest of the 1884 flood of 46.7 feet would be exceeded and that those affected should take precautions against a stage as high as or somewhat above the 1884 crest.

Was there anything in this warning which would lead reasonable men to conclude that flood waters might inundate this shipment? Water would have to rise nearly nine feet beyond the stage of 1884 before it would enter this car. Should the statement in the ten o'clock A. M. broadcast, to the effect that those affected should take precautions against a stage as high as or somewhat above the 1884 crest, lead reasonable men to conclude that it would amount to as much as nine feet more? It seems to us not.

The testimony is to the effect that there was no water around this car as late as four o'clock P. M. on the 23rd. Appellant contends that the fact that the railroad company did truck out some freight from the depot was a showing that they were apprehensive as to the safety of this merchandise, and that they should have taken the same precautions with respect to this car. The floor of this car was more than two feet above the floor of the merchandise of the freight depot.

A fair analysis of the testimony as regards these transactions is that the company took these shipments and moved them out by truck because they had connections to which they could send them, and they were naturally desirous and anxious to get them on the way. There is no evidence in the case that after it became apparent that flood waters might enter the car that trucking facilities were available to take these beans out of the yard or that trucks could have entered the yard at that time for the purpose of doing so, nor is there any evidence in the case showing that there was available storage space where this merchandise could have been stored.

The question in the case is: Did Appellee act as a reasonable prudent man would under all the circumstances existing as they did at that time? Did Appellee, in the light of conditions as they existed and under all the circumstances, do all that reasonable, prudent men would do to protect this property?

In answering this question we must look to conditions as they existed at the time and not as they developed subsequently. The burden rested upon Appellant to establish by competent evidence that Appellee was negligent in failing to provide for the safety of this shipment after the Act of God became imminent, and that it failed to act as a prudent man would under all the circumstances as they then existed. This, Appellant failed to do.

The judgment of the court is affirmed.